594

Barnum, Hammond, Stephens & Hoyt, Youngstown, for plaintiffs in error.

Harrington, Huxley & Smith, Youngstown, for defendant in error.

## OPINION

By NICHOLS, J.

In an action instituted by F. L. Stevenson in the Court of Common Pleas of Mahoning County, the jury, on October 31, 1935, returned a verdict in his favor for $17,000.00 against Grace Cronan, and against Sarah Williams' and Florence C. Keating, executrixes of the estate of Margaret M. Burke, deceased, doing business as Bannow Brook. Motion for a new trial, together with motion for judgment non obstante veredicto, were duly filed on behalf of Grace Cronan and the executrixes of the estate of Margaret M. Burke, deceased, which motions were overruled by the trial court and judgment entered upon the verdict.

The cause comes into this court on petition in error filed on behalf of Grace Cronan and the executrixes of the estate of Margaret M. Burke, deceased, as plaintiffs in error, against F. L. Stevenson, defendant in error, praying for reversal of the judgment of the Common Pleas Court and for final judgment in favor of plaintiff's in error. Hereinafter Mr. Stevenson will be referred to by name and the plaintiffs in error will be referred to as Bannow Brook.

On the evening of June 16, 1934, Mr. Stevenson and his wife, with certain relatives and friends, visited a public place of entertainment near Youngstown, called "Bannow Brook." Bannow Brook was then being operated by Grace Cronan and Margaret M. Burke, and consisted of several acres of enclosed ground, having upon it a number of trees and a dance floor which was in the open air, uncovered by any roof or side walls. A large number of tables and benches were scattered around the dance floor and throughout the grounds. Electric lights were hung at various places, about ten feet from the ground on poles and on trees. Mr. Stevenson and his friends arrived at Bannow Brook about eleven o'clock P. M., and were admitted to the grounds upon payment of the admission fee. A short time after reaching the premises, while Mr. Stevenson was watching the patrons leaving the dance floor during an intermission between the dances, a missile, consisting of some glass object, was seen to pass through the air and struck him in the left eye, causing his eye to be knocked out

and causing a cut on the right eye, and whereby the sight of the right eye is claimed to have been impaired in addition to the loss of the left eye.

It is conceded that the verdict of the jury is not excessive, but it is the contention of counsel on behalf of Bannow Brook that there is absolutely no evidence in the trial of the case below to support a verdict for Mr. Stevenson, and that the trial court committed prejudicial error in the following respects:

(1) In overruling motion of Bannow Brook for a directed verdict in its favor at the conclusion of plaintiff's case;

(2) In overruling the motion of Bannow Brook for judgment in its favor at the conclusion of all the evidence in the case;

(3) In overruling the motion of Bannow Brook for judgment non obstante veredicto;

(4) For error in the charge of the court to the jury;

(5) In overruling the motion of Bannow Brook for a new trial.

The parties apparently agree that the rule regulating the duty of care owed by Bannow Brook to Mr. Stevenson was the duty of exercising reasonable or ordinary care for his safety, and that Bannow Brook would be liable for injury resulting from breaching such duty. This duty of exercising ordinary care is proportioned to the dangers and perils reasonably to be apprehended from the lack of reasonable prudence and commensurate with the circumstances of the situation. Included in this duty of reasonable or ordinary care for his safety was the duty upon the part of Bannow Broow of exercising ordinary and reasonable means of supervision, inquiry and examination to protect him from wrongful acts of other patrons, where the proprietors knew or had reasonable grounds to anticipate such misconduct.

In his amended petition Mr. Stevenson alleged that while he was rightfully upon the premises known as Bannow Brook as a paid patron,

"a number of the patrons of defendants, seated at a table near to the southern gate of the dance pavilion, began to act in a disorderly manner; that there was a general quarrel at a table which culminated in a fist fight between two of the patrons of defendants who were in an intoxicated condition; that after this disorderly and unlawful conduct continued for some ten

or fifteen minutes, one of the patrons of defendants who was engaged in the fight threw a glass at the other combatant which struck this plaintiff in the left eye.

"Plaintiff further says that the disorderly ·conduct of the patrons was in the presence of the defendants and some of their employes or waiters, but that neither the defendants nor their employes made any atempt to quell the disorder or to restrain or control the actions of the said patrons engaged in the quarrel.

"* * * that on the said 16th day of June, there were a large number of patrons, exceeding twelve hundred in number, who had been admitted to the premises operated by these defendants as a pleasure resort; that numerous of said patrons were drinking alcoholic beverages and liquors; and that these defendants totally failed to provide adequate means or methods of controlling and supervising the conduct of patrons in and about the said premises and failed to make necessary arrangements to take the necessary precaution to properly safeguard the safety of their patrons.

"* * * that said date was on a Saturday evening and that these defendants knew or should have known that because of that fact there would be a large number of patrons admitted to their premises and having such knowledge they totally failed to provide police officers, attendants or other employes to properly handle such a large number of patrons.

"* * * that his injuries were caused directly and proximately by the negligence of defendants in the folowing particulars:

"1. In failing to have any police protection for the safety of their patrons, and particularly this plaintiff, upon the premises, when they had reason to believe that disorderly conduct as aforesaid might occur.

"2. In failing to attempt to control or restrain their patrons who were engaged in drunken combat after they had notice of their disorderly conduct as aforesaid.

"3. In failing to provide adequate attendants or police protection to adequately handle the conduct of the large number of persons they knew would be in and about the premises operated by them."

The error claimed in the overruling of the several motions of Bannow Brook is based upon the insufficiency of the evidence to warrant a verdict in favor of Mr. Stevenson upon any ground of negligence alleged in his petition and we are, therefore, required to analyze carefully the evidence shown in the record to the end that they may determine first whether at the conclusion of plaintiff's evidence, giving to it the interpretation most favorable to plaintiff, reasonable minds could come to no other conclusion than that Bannow Brook was not negligent in any respect alleged in the petition which was a direct and proximate cause of Mr. Stevenson's injuries; second, upon the motion for directed verdict at the conclusion of all the evidence and for judgment notwithstanding the verdict, giving to the evidence of each of the parties the interpretation most favorable to such party, reasonable minds could come to no other conclusion than that Bannow Brook was not guilty of any negligence alleged in the petition which was a direct and proximate cause of plaintiff's injuries; and third, in disposing of the motion for a new trial, whether the verdict of the jury is manifestly against the weight of the evidence.

We have no hesitancy in determining from the record and under the rules hereinbefore set forth that the court committed no prejudicial error in overruling the motion for directed verdict at the close of plaintiff's case, and in overruling the motion for directed verdict at the conclusion of all the evidence and in overruling the motion for judgment non obstante veredicto, as we find in the record evidence of probative value tending to prove one or more of the grounds of negligence alleged in plaintiff's petition and by reason of which it was required that the cause be submitted to the jury, leaving the question whether the verdict of the jury is manifestly against the weight of the evidence.

For the purpose of proving the nature of the business carried on at Bannow Brook, the plaintiff introduced testimony showing that a permit had been duly issued by the Probate Court to the defendants for the operation of Bannow Brook, as required by §13393 GC, and that at the time the permit or license was granted, and as required by law in such cases, a receipt was given by Grace Cronan for a copy of §§11393-1 and 11393-2 GC.

The pertinent portion of §13393-1, GC, reads:

"No person who is the proprietor of any public dance hall, or who conducts or manages or is in charge of any public dance hall, shall permit or allow the use of any intoxicating liquor, or the presence of in-

toxicated persons in such dance hall or on the premises on which such dance hall is located; * * *."

Sec 13393-2, GC, is the section providing for the penalty to be imposed upon those found guilty of violating §§13393 and 13393-1 GC.

By the testimony of Grace Cronan, one of the operators of Bannow Brook, called for cross examination upon behalf of the plaintiff, it is shown that there were actually eleven hundred patrons present at Bannow Brook on the night when Mr. Stevenson was injured, although Mrs. Cronan admitted that she had previously stated there were fifteen hundred persons present that night. Mrs. Cronan testified that there was usually a large crowd in attendance every Saturday night during the summer season; that six or seven persons were employed within the refreshment stand, fourteen waiters, seven employes on the dance floor, two persons selling tickets, two persons taking tickets, about five persons in the parking, and one deputy sheriff. Mrs. Cronan was interrogated, as follows:

"Q. Now, the service you rendered there was this—you served, you operated this dance floor and sold sandwiches, soft drinks and beer and 'set-ups' for all kinds of drinks.

A. What do you mean—'set-ups'?

Q. Ginger Ale, ice, glasses—you know you have seen them around there, haven't you?

A. Yes.

Q And you sold lots of it?

A. We sold some.

Q. And there was a lot of drinking of whiskey and other liquors on the ground?

A. I don't know. I never saw any taken.
* * *

Q. Do you recall the time when your deposition was taken in the preparation of the trial of this law suit?

A. Yes.

Q. And you were present with your attorney at the time it was taken?

A. Yes.
* * *

Q. Do you remember this question and answer, 'And it is a fact, isn't it, Mrs. Cronan, that oftentimes out there people bring liquor on the premises?' And your answer, 'Yes, they do.' Was that your answer?

A. Yes.

Q. And you know they bring it there?

A. Yes.
* * *

Q. Later on, Mrs. Cronan, in examination by your own counsel, Mr. Heim asked you this question: 'Mrs. Cronan, I believe you said, in answer to a question that Mr. Murphy asked you, that people did, at times, bring something stronger than 3.2 per cent beer in,' and your answer, 'Why, certainly they do; if there is any way that we can stop it, we will be eternally thankful to you. We have taken it up with Judge Woodside and Sheriff Stone and Sheriff Englehardt, but we are powerless?'

A. Yes.

Q. So the fact is it had been causing you constant annoyance? * * * sufficient so that you talked to the judge and sheriff and you knew it was being used quite generally?

A. I went to Judge Woodside and Sheriff Stone.

Q. And you complained about people bringing liquor on the grounds?

A. I complained. I asked what I could do.

Q. Mrs. Cronan, later on do you remember this question by your own attorney, Mr. Heim: 'What is the fact, do you permit it on the grounds?' And your answer, 'We are not responsible for what they bring in there, Judge Woodside tells us, any more than anything else. We wish they would not bring it in. I believe you know that it is legal to sell gingerale for any purpose they want to use it for, we don't ask them that; if they use it to mix their liquor with, that is their own look-out. We have a sign up we are not responsible for anything, and a man came to me last Saturday night and said when he went to dance he left a bottle of gin on the table and when he came back it was gone, and I just laughed and I said, I am glad of it; we don't want it in here, and if you lost it we are not a party to it, and that is just too bad.' That's correct, is it?

A. Absolutely correct."

The record discloses that all of the waiters employed at Bannow Brook were colored waiters.

"Q. They (the waiters) had no authority and the fact is you told them not to quell disorders?

A. I wouldn't need to tell them that. They wouldn't undertake to. No colored man would attempt to quell a disorder with white people. * * *

Q. I think you have already answered that you did not cut those out; that is, the furnishing of set-ups?

A. We didn't limit what they want,

coca-cola, or whatever they wanted, we served it, what they called for we served."

Mr. Randall Montgomery Sourbeck was called as a witness for plaintiff and testified that from the beginning of the season of 1933 until the end of 1934 he was employed at Bannow Brook during the evenings, having charge of the dance floor; that he was working on the night of June 16, 1934, and that he believed fifteen hundred to sixteen hundred people were there. The witness described the term "set-up", stating that it consisted of "a bottle of gingerale with cracked ice; not necessarily gingerale; any drink that is a good mixer." He further testified that "set-ups" were sold at Bannow Brook every night the place was in operation, and that there was quite a lot of liquor brought out on the night of June 16, 1934, and on other nights when the place was in operation prior to that time.

The witness further testified that one deputy sheriff was on duty at Bannow Brook on the night of June 16, 1934; that this deputy was outside the gate, directing traffic; that there was no policeman or deputy, as far as he knew, on the grounds; that some time during the evening he saw a man who had been struck by some glass object; that he did not actually see the man struck but went to the man just a moment later while the man was on his knees; that he assisted the man to his feet and took him to the house at Bannow Brook. This witness identified Mr. Stevenson as the man who had been struck in the eye. Mr. Sourbeck was asked whether he knew of disturbances or disorders that occurred there on the grounds either on this night Mr. Stevenson received his injury or during the season of 1934, up to and including June 16. The witness testified that "there might have been a few minor disorders but nothing serious, might have been a few people a little tight or a little drunk, but didn't cause any disorder, might be a lot of talking something like that." Being asked what he meant by "tight", the witness answered, "drinking too much."

After having his recollection refreshed, the witness recalled that upon one occasion a man was taken down to the county jail, and upon another occasion one of the patrons picked up a chair; that on one or two occasions if some one would get a little boisterous, word would be sent to a Mr. Keating and he would come soon thereafter and notify the patron that it was the desire that they be less noisy and he would like to have them quiet. This witness testified that when the accident occurred to Mr. Stevenson, it was sort of like lightning out of a clear sky to him.

On cross examination the witness being further inquired of as to the purpose for which gingerale was sold stated that he wouldn't assume that anyone would go out there and drink gingerale; that if he would see anyone sitting about and ask for a bottle of gingerale and ask the waiter to put ice in a glass, he would assume that the person brought something on his "hip." This witness testified that he did not see who hit Mr. Stevenson, or what hit him, and that he had not heard any loud talk or fight of any kind; that his duties were upon the dance floor.

Mr. John W. Barber, called as a witness for the plaintiff, testified that he was employed at Bannow Brook on the night of Saturday, June 16, 1934; that he worked in the parking lot until that was filled and then went to the north gate on the west side of the grounds where he collected the money from the people coming in; that on the night in question there was a deputy in uniform directing traffic, the deputy being stationed on the North Lime road. Being asked if he knew of any disturbance at Bannow Brook on the night of June 16, previous to the time Mr. Stevenson was injured, he testified:

"A. There was a disturbance out there, but I don't know whether it happened before or after."

The witness was asked the following question, to which he gave the following answer:

"Q. Do you know of a disturbance or fight that occurred there at Bannow Brook on this same night, in which one man threw a bottle at another one and missed him and hit another man, that occurred prior to 12:30 or 12:40 A.M.?
A. Yes, sir."

The witness further answered as follows:
"A. As I said before, I got tickets at the outside gate. It was about 11:15 and three couple were going out, and they were outside of Bannow Brook, right there at the ticket booth, and there was another couple, a girl had come in and the man was buying tickets, and one of the three fellows who were coming out,—I guess he was a little under the weather—* * * This fellow that bought the ticket took an exception to what the man said to the party of three,

and one thing led to another and this fellow buying the ticket walked over to him, and one of the three pulled out a bottle, * * * a flat bottle, whiskey bottle. * * * I ran out to see if I couldn't separate them. It only happened within ten feet of me, and this fellow took out a bottle and threw something at the man that took the tickets, and swung at the man and missed him and hit one of the fellows with him and knocked him out."

This witness testified that he knew liquor was brought into Bannow Brook on the nights he worked there; that he had seen "Charlie," one of the colored employes, gathering up the empty whiskey bottles after closing time; that the disturbance to which he had theretofore referred lasted five or six minutes; that the deputy saw the scuffling and ran down and was going to arrest the man, but that the deputy got to the scene of the fight when it was all over. This witness did not know of or see any other fight or disturbance on the premises that evening.

Mr. Walter P. Stoll, called as a witness for the plaintiff, testified that he was an employe of the White Drug Company in Youngstown, and that he had lived in Youngstown for twenty-seven years; that on the morning of June 16, 1934, he and a party of friends were at Bannow Brook, arriving there about nine o'clock P. M.; that around eleven-thirty or twelve o'clock, he had just finished dancing and came off the west exit of the dance floor, "there were two couple of us, and we stood by the exit gate and started to talk, and about a second after we came off there two fellows got in a fight. We didn't pay a whole lot of attention to the fellows, but we finally saw them rolling on the ground and hit each other, and we saw another fellow coming from the south to the north, I suppose walking down, and next thing we knew a bottle or glass had been thrown and hit this fellow. Hit the fellow who had been walking down." This witness testified that the fight went on for a few minutes; that it occurred within a few feet of him; that two men were doing the fighting; that he did not see anyone try to stop the fight; that he saw something thrown and that it struck some man standing there in front of the entrance to the dance floor; that this man who was struck was ten or fifteen feet from the fight; that he was struck in the face, that he knew it was glass that struck him because it apparently broke. He did not know whether it was a bottle or

a glass. This witness was not acquainted with Mr. Stevenson. On cross examination the witness stated that he did not see the missile in the air but saw it strike the man in the eye and break; that he did not see who threw the missile, but upon being asked what direction it came from, the witness answered: "There is only about one direction it could come from and that was the opposite direction from what I was walking." The witness had formerly testified that the man who was struck was walking in the general direction of the fight.

William E. Ballentine, a witness called by the plaintiff, testified that he had lived in Youngstown for twenty years and that he had been employed for fifteen years by the Dollar Savings & Trust Company; that he visited Bannow Brook just once, being on the night in question. This witness testified as follows:

"A. I was coming off the dance floor, the entrance toward the—the exit toward Market Street, and as I was walking down the path the lady with whom I was dancing, an object of some sort struck a man on our left. It seemed to come from a little group on our right. * * * It came across in front of us right beside the path."

The witness further testified that the man who was struck was on his left just south of the entrance to the dance floor; that he just saw a confusion of people (to his right) and that the missile came from that direction and struck the man in the face; that it was the witness' best judgment that the missile traveled approximately twenty feet from the point where this confusion was before it struck the man in the face; that the missile went from north to south and struck the man who was facing north; that the missile went right across this witness' face before striking the man.

Dr. Carl J. Cubbison, a practicing physician of Wilkinsburg, Pa., one of the party who went with Mr Stevenson to Bannow Brook, testified that after their party went upon the grounds and when they were about to sit at a table, there was a commotion at the table next to them where the people were apparently very much intoxicated and were throwing bottles up among the lights in the trees; that during the time he was on the grounds he saw patrons using whiskey; that the first table where his party was going to sit down was next to the one where patrons were drinking, several of them, and were very much intoxicated, with bottles around the table

and under it; that Mr. Stevenson left the party and started to walk about the grounds. This witness didn't know that Mr. Stevenson had been injured until after the occurrence.

On cross examination this witness testified that whiskey bottles, pints, were sailing through the air, being thrown at the light bulbs, one of which was broken, but that he did not see any bottle hit any person; that he and his party moved three or four tables away from the one at which the bottles were being thrown at the lights; and that he did not see any one try to curb intoxicated persons who were staggering, swearing and using terrible language; that he did not see any fight.

The defendants offered but two witnesses, the first being John Riesen, who testified that on the evening of June 16th, 1934, he was at Bannow Brook in the capacity of a deputy sheriff, working out of the county sheriff's office; that his orders from the sheriff were to keep law and order and to take care of traffic on the highway; that about 9 or 9:30 o'clock traffic started to come in and he was on the highway. Later on, after the traffic slowed down, he would go in and make rounds through the grounds and go on the road again; that he was dressed in uniform; that he couldn't recall exactly but thought that he made three or four rounds on the grounds, beginning about ten o'clock, the last round being about midnight or shortly after; that as far as he could see the people who were there as patrons were conducting themselves in an orderly fashion. Mr. Riesen first stated that he knew of no disorderly conduct on the premises that night, but later, being asked if he recalled of seeing anyone get into an altercation, said:

"I can't recall the time or anything about it, but I know I was at the highway and some one drawed my attention and I looked back and out on the highway a couple of men were having quite a commotion. When I got there one man said, 'Arrest this man for striking me,' and then some one said, 'You have the wrong man,' and everything was dropped and they thanked themselves and went on."

This witness testified that he had never been called on to make any arrest or cause people to quit fighting or stop any brawls of any kind. There wasn't any other deputy at Bannow Brook on the night in question. Being asked whether, at the time he made his rounds through the grounds, he

saw any liquor on the premises, the witness answered:

"Not that I could say was liquor.. What I mean by that is, I didn't go and take a bottle and smell of it or sample it. I have seen bottles. I wouldn't swear what was in them. * * * It was very seldom that I mixed with people at the tables."

The witness testified that he did not make it his business to find out what was in the bottles. On cross examination this witness further testified that while he was out on the road directing traffic "somebody told me there was a fight or someone was injured, and I went in * * * it was one of the waiters or some of the men that worked there that told me about it."

The other witness called on behalf of the defendants was Mrs. Grace Cronan, one of the defendants, who testified that up to the time Mr. Stevenson was hurt she had not known of any previous trouble of any kind. On cross-examination Mrs. Cronan was asked the following question, to which she replied as follows:

"Q. Just one question, Mrs. Cronan, in your effort to break up this practice of bringing liquor, did you ever try curtailing of the sales of 'set-ups'? * * *
A. I have a permit to sell gingerale."

It was then that the witness stated, as hereinbefore set forth, that she didn't limit "what they wanted, coca-cola or whatever they wanted, we served it; what they called for we served."

We think we have set forth sufficient of the evidence in this case from which the jury would clearly understand that in the operation of the dance pavilion, known as Bannow Brook, the defendants, in violation of law, permitted intoxicating liquors to be brought upon the premises and used; that the defendants encouraged the use of intoxicating liquor upon the premises and glasses, gingerale and ice, commonly called "set-ups", and well known to patrons of such places that these "set-ups" are for the purpose of mixing intoxicating liquors; that this practice had been going on for a long time previous to the night on which Mr. Stevenson was injured. While there is no testimony of any witness to the effect that these persons engaged in the fight and from whose direction the missile was thrown which struck Mr. Stevenson were seen to drink intoxicating liquor or were in a state of intoxication, yet, we think the jury could

reasonably find from the evidence that these fighting persons were intoxicated, taking into consideration the very general use of intoxicating liquor upon the premises and it being of common knowledge that intoxicated persons are apt to engage in brawls and disorderly conduct and that sober persons are not ordinarily so inclined. The jury deals in the probabilities of the case.

Although approximately twelve hundred people were reasonably expected upon the premises, many of whom to the knowledge of these proprietors would bring intoxicating liquor and drink the same while there, but one deputy sheriff was provided and his duties were largely on the outside of the grounds directing automobile traffic.

There were, apparently, from the evidence, two fights upon the premises upon the evening in question, and this deputy was not present until after each of the fights was over. We think the jury might have found from this evidence that the exercise of reasonable and ordinary care upon the part of the proprietors of Bannow Brook would have required that at least one officer be stationed upon the grounds at all times, and that the presence of one or more officer continuously on the grounds would, in all probability, have prevented the fight engaged in by the patrons and from the direction of which the missile was thrown which struck Mr. Stevenson in the eye.

As stated in the opinion in the case of Baseball Company v Eno, 112 Oh St 182, since the management had expressly invited the plaintiff to come upon its premises, it was its duty to exercise ordinary care not to invite him into danger, and to that end it was its duty to exercise ordinary care to render the premises reasonably safe during the period of plaintiff's sojourn there as an invitee. Being in the business of providing public entertainment for profit it was bound to exercise care commensurate with the circumstances of the situation to protect patrons against injury. It was a question of fact for the jury whether the owner performed this duty * * *. The jury in this case would take into consideration the fact that persons who engaged in the business of conducting a public dance are required by law to prohibit the use of intoxicating liquors upon the premises, and that it was the duty of these proprietors to discontinue this business when they found that they were unable to conduct it according to law.

As clearly disclosed by the evidence that these proprietors encouraged the use of intoxicating liquors upon the premises operated by them as a place for public dancing, it was the province of the jury to determine from all the circumstances whether or not the proprietors of Bannow Brook had exercised reasonable or ordinary care for the safety of Mr. Stevenson under the circumstances shown to exist, and we are not able to find that the verdict of the jury is otherwise than warranted by the evidence, unless the further contention of counsel for Bannow Brook in relation to the charge of the court to the jury is to be sustained.

There is no complaint as to the charge of the court to the jury except in that in the charge of the court it made the following statement:

"Included in the duty of ordinary care resting upon the defendants, as proprietors of the place in question, was a statute of the State of Ohio which reads as follows: " 'No person who is the proprietor of any public dance hall, or who conducts or manages or is in charge of any public dance hall, shall permit or allow the use of any intoxicating liquor, or the presence of intoxicated persons in such dance hall or on the premises on which such dance hall is located'."

It is the claim of counsel for Bannow Brook that the court committed prejudicial error in charging the jury upon the law of the State of Ohio as contained in §13393-1 GC, for the reason that in the trial of the case plaintiff below produced no evidence showing that the use of intoxicating liquors, or the presence of intoxicated persons on the premises, had any causal connection with the injury of plaintiff, and for the further reason that in order to charge the statute, as hereinbefore set forth, it must appear that the statute imposed an obligation for the benefit of the person alleging the injury.

Referring to the case of Gedeon, Admr. v The East Ohio Gas Company, 128 Oh St 335, 190 NE 924, it is held in the syllabus that "damages for an injury resulting from a negligent act of the defendant may be recovered if a reasonably prudent and careful person, under the same or similar circumstances, should have anticipated that injury to the plaintiff or to those in a like situation would probably result."

In the opinion in the above case, at page 338, the court says:

"It is not necessary, however, that in-

jury to the plaintiff, himself, be foreseeable. It is enough that the act in question may, in human probability, produce harm to persons similarly situated. Nor is it necessary that the defendant himself, actually anticipate or foresee the probability of injury to anyone. It is enough that the probability of injury to those in the plaintiff's general situation should have been perceived by a reasonably prudent° and careful person. Lane v Atlantic Works, 111 Mass. 136; **Toledo Railways and Light Co. v Rippon**, 8 C.C. (N.S.) 334, 18 C.D. 561, affirmed without opinion 75 Oh St 609, 80 NE 1133; **Harriman v Railway Co., supra, 45 Oh St 11**, at p. 36, 12 NE 451."

Applying these principles, it was, in our opinion, for the jury to say whether under the facts shown in the record, the probability of injury to the plaintiff, or to those in a like situation, should have been anticipated by Bannow Brook as a probable result of allowing intoxicated persons upon the premises, and allowing intoxicating liquors 'to be used thereon by its patrons.

It is well recognized that if Mr. Stevenson rests his case upon the violation of some duty upon the part of Bannow Brook, it must appear that the duty is owed to him; else it will not avail him to show that Bannow Brook was violating the command of §13393-1 GC. Before the failure of Bannow Brook to observe the requirements of this statute can constitute the basis of a claim of negligence it must appear that the prohibitory ·requirements of this statute were enacted for the safety of Mr. Stevenson, or of those in a like situation with him, and we agree that if the prohibitory provisions of this enactment are merely for the government of the morals of the patrons who may visit the public dance, then the statute can not be made the basis of recovery and negligence can not be founded upon a violation thereof.

As has been frequently said, negligence does not occur in the abstract. It has not been claimed by counsel for Mr. Stevenson in this case that the violation of the statute in question constituted negligence per se, and it is conceded on behalf of counsel for Bannow Brook, in the able brief filed in this court, that if a drunken person present on the premises, with the knowledge of the owner, had committed the particular act which produced Mr. Stevenson's injuries, then the giving of this statute in the charge of the court might have been acceptable. This admission upon the part of counsel for Bannow Brook seems to con-

cede that the statute in question was enacted not alone to govern the morals of persons attending the public dance, but was enacted for the safety of Mr. Stevenson and others in like situation.

By analogy, let us see whether the statute in question was enacted solely to govern the morals of persons attending the public dance. Would anyone claim that the statute of Ohio which provides that no person shall operate a motor vehicle upon public highways while in a state of intoxication was enacted to govern the morals of persons driving automobiles? Clearly, we think, the statute prohibiting the driving of motor vehicles by intoxicated persons was enacted for the safety of other persons lawfully using the highways. It is significant that we find no legislative enactment which prohibits the owners of theaters from allowing intoxicated persons or intoxicating liquors in the theater or upon the premises where theaters are located. We know of no statute which prohibits intoxicating liquors or intoxicated persons from attending church gatherings, political meetings, bowling alleys, billiard parlors or confectioneries.

We are forced to conclude that §13393-1 GC was enacted for the safety of persons attending public dances. The writer of this opinion can readily understand the necessity of the statute for this purpose. Nothing is so likely to provoke confusion, disorder and fights as for one person to attempt to induce another's dance partner to abandon her escort and dance with such one, and when a person becomes intoxicated such conduct will likely end in a fight. The framers of· this legislation had the proper concept of the probable results following the use of intoxicating liquors and the presence of intoxicated persons at public dances.

In the instant case it is shown by the record that the proprietors of Bannow Brook were well aware that the statute prohibited these proprietors to permit intoxicated persons on the premises where the public dance was being held; were .well aware that they must not permit intoxicating liquors on the premises, and if persons desire to operate public dance halls, they must undertake that they will be operated only in accordance with the salutary provisions of the Code relating thereto. · The proprietors of Bannow Brook encouraged the violation of this statute by the furnishing of the so-called "set-ups," and they can not be heard to say, as shown in the record, that they did not wish in-

toxicated persons upon the premises, or intoxicating liquors to be brought thereon. If they could not operate the dance hall according to law, they could close it when they found the law being violated to the extent that they could not check or curb the violation thereof, or continue its operation and assume the risk of liability.

One of the ways in which Bannow Brook is alleged to have failed in its duty to exercise reasonable and ordinary care for the safety of Mr. Stevenson while he was present as a paid invitee of Bannow Brook, was in failing to provide adequate attendants and police protection to handle the conduct of the large number of persons they knew would be in and about the premises operated by them. In order that the jury might find whether this duty had been breached, we think it proper that the jury be informed as to the law which prohibited Bannow Brook from permitting intoxicated persons or intoxicating liquors upon the premises. In the opinion of the jury, this requirement of the law may have necessitated a greater number of policemen upon the premises in the exercise of ordinary care for the safety of Mr. Stevenson. At least it was a fact proper to be considered by the jury in that regard and in connection with all other relevant facts and circumstances shown in the record.

It was not necessary to a recovery in this case that the manner of injury to the plaintiff by being struck in the eye by a thrown missile be foreseeable. It was enough if Bannow Brook's failure to exercise ordinary and reasonable care in policing its premises may, in human possibility, produce harm to persons similarly situated, nor was it necessary that Bannow Brook actually anticipate or foresee the probability of injury to any particular person. It was enough that the probability of injury to those in the plaintiff's general situation, should have been perceived by a reasonably prudent and careful person. Gedeon, Admr. v The East Ohio Gas Company, supra.

We find no prejudicial error in the charge of the trial court wherein the jury was instructed that included in the duty of ordinary care resting upon the defendants, as proprietors of the place in question, was the statute of the State of Ohio which prohibited the proprietor of any public dance hall, or who conducts or manages or is in charge of any public dance hall, from permitting or allowing the use of any intoxicating liquor, or the presence of intoxicated persons in such dance hall, or on the premises on which such dance hall is located, and that it was the province of the jury to take this statute into consideration in determining whether, under all the facts and circumstances shown in the record, the proprietors of Bannow Brook were guilty of negligence which was a direct and proximate cause of plaintiff's injuries.

Having found that the verdict of the jury is not manifestly against the weight of the  evidence, and having considered all of the errors assigned on behalf of Bannow Brook, and being unable to find that substantial justice has not been done in this case, the judgment of the Common Pleas Court must be and the same is affirmed.

Judgment affirmed.

CARTER, J, concurs.
ROBERTS, J, dissents.